Mel C. Orchard, III (WSB # 5-2984)
Emily S. Madden (WSB # 7-6272)
THE SPENCE LAW FIRM, LLC
15 S. Jackson Street / P.O. Box 548
Jackson, WY 83001
307-733-7290 / 307-733-5248 (fax)
orchard@spencelawyers.com
madden@spencelawyers.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| NANCI TURNER STEVESON,<br><br>    Plaintiff,<br><br>    vs.<br><br>JOHNSON & JOHNSON, *a New Jersey corporation*, JOHNSON & JOHNSON HOLDCO (NA) INC., *a New Jersey corporation*, and RED RIVER TALC LLC, *individually and as successor in interest to Johnson & Johnson Consumer, Inc.*,<br><br>    Defendants. | Civil No. _____ |

## COMPLAINT

Plaintiff, Nanci Turner Steveson, by and through counsel, Mel C. Orchard, III and Emily S. Madden of THE SPENCE LAW FIRM LLC, pleads and alleges her causes of action against Defendants as follows:

### I.    INTRODUCTION

1.    This action arises from Plaintiff's regular and prolonged use of and exposure to Johnson & Johnson Baby Powder and Shower to Shower™, talc-based body powder products designed, manufactured, marketed, distributed, and sold by Defendants and their corporate predecessors (collectively, the "Products"). Plaintiff used the Products for personal hygienic

purposes over an extended period of time, resulting in repeated exposure to talc in the perineal and genital area. As a direct and proximate result of that exposure, Plaintiff developed ovarian cancer. Plaintiff brings this action to recover for the injuries and damages caused by Defendants' negligent, reckless, willful, and wrongful conduct in connection with the design, development, manufacture, testing, formulation, packaging, labeling, promotion, marketing, distribution, and sale of the Products.

## II.   THE  PARTIES

2.      Plaintiff Nanci Turner Steveson is a Wyoming citizen who is and was at all relevant times residing in Teton County, Wyoming.

3.      Defendant Johnson & Johnson is a corporation organized and existing under the laws of New Jersey, and it has its principal place of business in New Brunswick, New Jersey.

4.      At all relevant times, Defendant Johnson & Johnson was engaged, directly and through its subsidiaries and affiliated entities, in the business of researching, designing, developing, manufacturing, testing, packaging, labeling, marketing, promoting, distributing, and selling consumer products, including Johnson's® Baby Powder and Shower to Shower™ (hereinafter "Products").

5.      At all times relevant to this action, Johnson & Johnson conducted substantial business in the State of Wyoming and placed, or caused to be placed, the Products into the stream of commerce for purchase and use by consumers in Wyoming.

6.      Defendant Johnson & Johnson HoldCo (NA) Inc. is a corporation organized and existing under the laws of New Jersey, with its principal place of business in New Brunswick, New Jersey.

7. Defendant Johnson & Johnson HoldCo (NA) Inc. is a successor to certain assets, operations, rights, and obligations formerly associated with Johnson & Johnson's consumer-products business following the corporate restructuring of the entity formerly known as Johnson & Johnson Consumer Inc.

8. To the extent Defendant Johnson & Johnson HoldCo (NA) Inc. succeeded to liabilities arising from the design, manufacture, testing, labeling, marketing, promotion, distribution, or sale of Johnson's® Baby Powder and Shower to Shower™, Defendant Johnson & Johnson HoldCo (NA) Inc. is liable to Plaintiff for the claims alleged herein.

9. Defendant Red River Talc LLC is a Texas limited liability company with its principal place of business in New Brunswick, New Jersey.

10. Defendant Red River Talc LLC was created as part of a series of corporate restructurings involving Johnson & Johnson's talc-related liabilities.

11. As a result of those restructurings, liabilities arising from claims in North America involving ovarian and other gynecological cancers allegedly caused by talc or talc-containing products were allocated to Defendant Red River Talc LLC.

12. Plaintiff's claims arise from ovarian cancer caused by her use of and exposure to Johnson's® Baby Powder and Shower to Shower™ and therefore fall within the category of talc-related liabilities allocated to Defendant Red River Talc LLC.

13. Defendant Red River Talc LLC is liable as a successor, assignee, transferee, and/or entity to which the talc-related liabilities at issue in this action were allocated.

14. As corporations, Defendants can act only through their directors, officers, agents, and employees.

15.     Defendants are vicariously liable for the negligent, reckless, willful, and wanton acts and omissions of their officers, directors, agents, and employees who were acting within the course and scope of their employment at the time of such acts or omissions.

16.     Unless otherwise indicated, references herein to "Defendants" include Johnson & Johnson, Johnson & Johnson HoldCo (NA) Inc., and Red River Talc LLC, including their respective predecessors, successors, subsidiaries, divisions, agents, and affiliated entities, to the extent each is legally responsible for the conduct, liabilities, acts, omissions, products, and injuries alleged herein.

### III.    JURISDICTION AND VENUE

17.     Plaintiff realleges and incorporates Paragraphs 1–15 above as if fully set forth herein.

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this suit is between citizens of different states, and the amount in controversy for this matter exceeds $75,000.00, exclusive of interest and costs.

19.     This Court has personal jurisdiction over Defendants because they purposefully directed their activities at residents of Wyoming and the acts and omissions that gave rise to this action occurred in Teton County, Wyoming.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, actions, or omissions giving rise to this action occurred within the District of Wyoming.

### IV.    FACTS COMMON TO ALL CAUSES OF ACTION

**A.  Johnson & Johnson marketed its Products for daily personal use and feminine hygiene**

21.     Defendant Johnson & Johnson and its consumer-product subsidiaries manufactured, marketed, and sold talc-based body powders, including Johnson's® Baby Powder and Shower to Shower™.

22.     Historically, Johnson's® Baby Powder was marketed as a product associated with freshness, cleanliness, softness, and purity.

23.     Although sold under the name "Baby Powder," Johnson's® Baby Powder was not marketed solely for use on infants.

24.     Johnson & Johnson also marketed its Baby Powder for regular personal use by women and teenage girls.

25.     Johnson & Johnson represented that Johnson's® Baby Powder could absorb moisture, reduce friction, and help consumers remain dry, soft, fresh, and comfortable.

26.     Johnson & Johnson also marketed Johnson's® Baby Powder as "clinically proven gentle and mild."

27.     Product labeling for Johnson's® Baby Powder stated: "For you, use every day to help feel soft, fresh, and comfortable."

28.     Johnson & Johnson marketed its Baby Powder as suitable for feminine hygiene and promoted its use on and around the genital and perineal areas to mask or prevent odors.

29.     Johnson & Johnson's Shower to Shower™ was a talc-based deodorant body powder developed and marketed for use by adults.

30.     Johnson & Johnson promoted Shower to Shower™ as a body powder intended to address perspiration, moisture, and odor and to help consumers feel dry, fresh, and comfortable throughout the day.

31.     Unlike a product promoted only for application under the arms, Johnson & Johnson expressly marketed Shower to Shower™ for use on multiple areas of the body.

32.     One Shower to Shower™ advertisement stated: "Your body perspires in more places than just under your arms. Use Shower to Shower™ to feel dry, fresh and comfortable throughout the day."

33.     Another Shower to Shower™ advertisement stated that the product "can be used all over your body."

34.     Johnson & Johnson also promoted the Products with the slogan: "A sprinkle a day keeps odor away."

35.     Through these advertisements and representations, Johnson & Johnson encouraged regular, whole-body use of Shower to Shower™, including use by female consumers as part of their personal- and feminine-hygiene routines.

**B.   The Properties of Talc and the Availability of Cornstarch Alternatives**

36.     Johnson's® Baby Powder and Shower to Shower™ were talc-based body powders that contained talc as their principal ingredient.

37.     Chemically, talc is a hydrous magnesium silicate composed principally of magnesium, silicon, oxygen, and hydrogen.

38.     When talc-based powders are repeatedly applied to the female genital and perineal areas, talc particles are capable of entering and migrating through the female reproductive tract.

39.     Talc particles that migrate through the female reproductive tract are capable of reaching internal reproductive tissues, including the fallopian tubes and ovaries.

40.     At all relevant times, talc was not necessary for the Products to perform their intended cosmetic functions.

41.     A feasible talc-free alternative to the Products existed in the form of cornstarch-based body powder.

42.     Cornstarch-based powders absorb moisture and perform the same or substantially similar cosmetic functions for which Johnson & Johnson marketed their talc-based body powders.

43.     Johnson & Johnson itself researched, developed, marketed, and sold cornstarch-based body powder as an alternative to talc-based Johnson's® Baby Powder.

44.     Johnson & Johnson conducted consumer testing of cornstarch-based body powders as early as the 1960s and 1970s and found substantial consumer acceptance of cornstarch as a body-powder ingredient.

45.     By at least the 1970s, Johnson & Johnson was internally considering and evaluating cornstarch as an alternative to talc for its body-powder products.

46.     Johnson & Johnson ultimately marketed and sold Johnson's® Baby Powder formulated with cornstarch while continuing to market and sell its talc-based powder products.

47.     Cornstarch-based powder was therefore a technically and commercially feasible alternative capable of providing substantially similar cosmetic benefits without exposing consumers to talc particles.

48.     Despite the availability of this alternative, Johnson & Johnson continued to manufacture and sell talc-based Johnson's® Baby Powder for decades.

C.   Defendants' Knowledge of the Association Between Talc Use and Ovarian Cancer

49.     Scientific literature regarding the potential relationship between talc and ovarian cancer dates back more than five decades.

50.     In 1971, Dr. W.J. Henderson and his colleagues published a study addressing the presence of talc in ovarian and cervical tissue and its potential relationship to cancer.

51.    Upon information and belief, when the U.S. Food and Drug Administration (FDA) was considering limits on asbestos in cosmetic talc products in 1976, Johnson & Johnson falsely represented to the FDA that asbestos had not been detected in any sample of talc produced between December 1972 and October 1973.

52.    Upon information and belief, Johnson & Johnson failed to disclose to the FDA that testing performed by at least three different laboratories between 1972 and 1975 had reported the presence of asbestos in its talc. In one instance, the laboratory reported the level of asbestos as "rather high."

53.    In 1982, Dr. Daniel Cramer and his colleagues published an epidemiological study examining the relationship between the genital use of talcum powder and ovarian cancer.

54.    The study reported a statistically significant association between genital talc use and ovarian cancer, including an approximately 92% increased risk among women who reported such use.

55.    Following publication of the study, Dr. Bruce Semple, acting on behalf of Johnson & Johnson, met with Dr. Cramer to discuss the findings.

56.    During that meeting, Dr. Cramer advised Dr. Semple that Johnson & Johnson should warn consumers of the potential risk of ovarian cancer associated with genital use of its talcum powder products so that consumers could make informed decisions regarding their use of those products.

57.    In the decades following the 1982 Cramer study, at least 22 other epidemiological studies have examined the association between genital talc use and ovarian cancer. A substantial body of this research reported an elevated risk of ovarian cancer among women who used talcum powder in the genital or perineal area.

58. In 1993, the United States National Toxicology Program (NTP) published the results of toxicology and carcinogenicity studies involving non-asbestiform, cosmetic-grade talc. Following inhalation studies conducted in laboratory animals, the NTP reported some evidence of carcinogenic activity in male rats and clear evidence of carcinogenic activity in female rats exposed to talc. These findings added to the body of scientific evidence concerning potential carcinogenic effects associated with exposure to talc.

59. During this period, the Cosmetic, Toiletry and Fragrance Association (CTFA), an industry trade association whose membership included Johnson & Johnson, organized the Talc Interested Party Task Force (TIPTF).

60. Through the TIPTF, participating talc manufacturers and suppliers pooled financial and other resources and coordinated their response to scientific and regulatory concerns regarding the safety of talc.

61. Upon information and belief, Johnson & Johnson and other TIPTF participants funded and participated in scientific research concerning talc, reviewed and provided input regarding scientific reports and other materials before their submission to governmental and regulatory agencies, developed and disseminated information concerning the safety of talc, and communicated with regulatory authorities regarding the regulation and classification of talc.

62. Upon information and belief, Johnson & Johnson's participation in these coordinated activities was intended, at least in part, to challenge or minimize scientific evidence associating talc use with cancer, oppose regulatory restrictions and warning requirements applicable to talc products, and reassure consumers regarding the safety of continued talc use.

63. Through these efforts, Johnson & Johnson sought to influence the scientific, regulatory, and public discussion regarding the health risks associated with talc while continuing

to manufacture, market, promote, and sell talc-containing products without adequate warnings concerning those risks.

64.    In November 1994, the Cancer Prevention Coalition sent correspondence to Johnson & Johnson's then-Chief Executive Officer, Ralph Larsen, advising Johnson & Johnson of scientific literature associating frequent genital use of talcum powder with an increased risk of ovarian cancer. The correspondence cited, among other scientific literature, research conducted by Dr. Bernard Harlow and colleagues at Harvard Medical School concerning the relationship between genital talc use and ovarian cancer.

65.    The Cancer Prevention Coalition further advised Johnson & Johnson of the serious nature of ovarian cancer, including its significant mortality and the difficulty of detecting the disease at an early stage. The correspondence urged Johnson & Johnson to discontinue the sale of talc-based body powders in favor of available cornstarch-based alternatives or, at a minimum, to provide consumers with warnings regarding the potential ovarian-cancer risks associated with genital use of talc.

66.    The November 1994 correspondence provided Johnson & Johnson with additional direct notice of scientific concerns regarding the relationship between genital talc use and ovarian cancer and specifically placed the company on notice that consumer warnings had been requested as a means of allowing women to make informed decisions regarding use of its talc-based products.

67.    By 1996, health concerns surrounding the use of talc in products capable of coming into contact with the female genital tract had also reached the condom industry. Condom manufacturers discontinued or began discontinuing the use of talc as a dusting agent on condoms amid concerns regarding potential reproductive and ovarian health effects associated with talc exposure.

68.     In 2006, the International Agency for Research on Cancer (IARC), the specialized cancer agency of the World Health Organization, evaluated the carcinogenic risks associated with talc. As part of that evaluation, IARC classified the perineal and genital use of talc-based body powder as "possibly carcinogenic to humans," or Group 2B.

69.     In reaching its 2006 classification, IARC reviewed epidemiological studies examining the relationship between perineal talc use and ovarian cancer. IARC concluded that there was "limited evidence in humans for the carcinogenicity of perineal and genital use of talc-based body powder." Under IARC's classification framework, limited evidence exists where a positive association has been observed between an exposure and cancer and a causal interpretation is considered credible, although chance, bias, or confounding cannot be excluded with reasonable confidence.

70.     The IARC evaluation provided Johnson & Johnson with additional notice of the scientific evidence associating the perineal and genital use of talc-based body powders with ovarian cancer and of the potential health risks arising from the intended and foreseeable use of their talc-containing products.

71.     During approximately the same time period, talc was classified under Canada's Workplace Hazardous Materials Information System (WHMIS) as a Class D, Division 2, Subdivision A (D2A) substance, which is a classification designated for "very toxic" materials capable of causing serious chronic health effects. For context, asbestos was likewise classified within the D2A category.

72.     Also in 2006, Imerys Talc, a supplier of talc used in Johnson & Johnson's products, began placing a warning on the Material Safety Data Sheets (MSDS) it provided to Johnson &

Johnson. These MSDSs included warnings about the IARC classification and Canada's D2A classification. It also included a "States Rights to Know" warning.

73. Accordingly, Johnson & Johnson received and/or had access to information from its talc supplier concerning the classifications and potential health hazards associated with talc as early as 2006.

74. Johnson & Johnson knew or, through the exercise of reasonable care, should have known of the scientific literature, governmental and international classifications, supplier information, and other evidence concerning the potential health risks associated with the intended and foreseeable use of their talc-containing products.

75. As manufacturers, sellers, distributors, and marketers of the Products, Johnson & Johnson had a duty to investigate and remain informed concerning risks associated with the Products and to provide adequate warnings and instructions concerning hazards that were known or reasonably knowable.

76. Despite their actual or constructive knowledge of the foregoing information, Johnson & Johnson failed to provide consumers, including Plaintiff, with adequate warnings concerning the risk of ovarian cancer allegedly associated with the intended and foreseeable perineal and genital use of the Products.

77. Instead, Johnson & Johnson continued to market, promote, distribute, and sell the Products for personal and feminine hygiene uses without adequately disclosing the scientific evidence and health concerns regarding the association between perineal and genital talc use and ovarian cancer.

78. Upon information and belief, Johnson & Johnson also participated in the development and dissemination of information intended to dispute, minimize, or cast doubt upon

scientific evidence concerning the health risks associated with talc and sought to influence the scientific and regulatory discussion concerning the safety of talc-containing products. As a result, consumers were not adequately informed of material information necessary to evaluate the risks associated with continued use of the Products.

79.    Upon information and belief, Johnson & Johnson procured and disseminated false, misleading, and biased information regarding the safety of the Products to the public and used influence over governmental and regulatory bodies regarding talc.

80.    Johnson & Johnson had a duty to warn about the hazards associated with the use of its Products.

81.    Johnson & Johnson failed to warn consumers of the known health hazards associated with the use of its Products.

82.    On May 19, 2020, Johnson & Johnson announced the discontinuation of sale of all talc-based Johnson's® Baby Powder in the United States and Canada.

83.    Johnson & Johnson discontinued its talc-based Baby Powder globally in 2023.

84.    Johnson & Johnson continued to market and sell Shower to Shower™ until 2012, when it sold the Shower to Shower™ product line to Valeant Pharmaceuticals North America. The product remained talc-based after the sale until 2018, when its subsequent owner reformulated Shower to Shower™ using cornstarch instead of talc.

## D.   Plaintiff's Use of the Products and Ovarian Cancer Diagnosis

85.    Plaintiff used both Johnson's® Baby Powder and Shower to Shower™ as part of her regular personal- and feminine-hygiene routine.

86.    Plaintiff first began using Johnson's® Baby Powder in approximately 1970, when she was twelve years old and began menstruating.

87.     Beginning at that time, Plaintiff would sprinkle Johnson's® Baby Powder in her underwear after showering between menstrual periods to help her remain fresh while going through puberty.

88.     Plaintiff also used Johnson's® Baby Powder under her arms for freshness and odor control.

89.     Plaintiff later began using Shower to Shower™ for substantially similar personal- and feminine-hygiene purposes.

90.     Over the course of more than forty years, Plaintiff regularly and repeatedly used one or both of the Products, including daily or near-daily application of talc-based powder to her underwear and genital and perineal areas.

91.     The Products were marketed and represented as appropriate for regular personal use and did not contain a warning that genital or perineal use of talc-based powder could increase the risk of ovarian cancer.

92.     In reliance on the Products' labeling, marketing, and absence of warning, Plaintiff believed that the Products were safe for external use, including use on and around the genital and perineal areas.

93.     Plaintiff purchased and used the Products with the understanding that they were safe when used in the manner marketed and reasonably anticipated by Johnson & Johnson.

94.     Plaintiff's use of the Products was consistent with the personal- and feminine-hygiene uses for which Johnson & Johnson marketed and promoted its talc-based body powders.

95.     Plaintiff used the Products in an intended and reasonably foreseeable manner.

96.     Plaintiff eventually learned of reports concerning potential health risks associated with the use of talc-based body powders.

97.    After learning of those reported risks, Plaintiff discontinued using talc-based powder in her underwear and on her genital and perineal areas.

98.    Had Plaintiff been warned that regular genital and perineal use of talc-based powder could increase her risk of developing ovarian cancer, she would not have purchased or used the Products in that manner.

99.    In December 2025, diagnostic imaging revealed an approximately 15-centimeter mass involving Plaintiff's right ovary.

100.    Further diagnostic evaluation and biopsy confirmed ovarian carcinosarcoma, a rare and aggressive form of ovarian cancer.

101.    Plaintiff was 67 years old when she was diagnosed with ovarian cancer.

102.    On January 15, 2026, Plaintiff underwent a total hysterectomy and surgical removal of additional tissue or a node located near her liver as part of treatment for her ovarian cancer.

103.    Plaintiff continues to undergo medical treatment, monitoring, and follow-up care for ovarian cancer.

## V.    FIRST CAUSE OF ACTION: STRICT LIABILITY
### (FAILURE TO WARN)

104.    At all relevant times, Johnson & Johnson was engaged in the business of manufacturing, marketing, distributing, and selling the Products in Wyoming.

105.    At all relevant times, Johnson & Johnson and its consumer-product subsidiaries and predecessors designed, manufactured, marketed, distributed, and sold Johnson's® Baby Powder and Shower to Shower™ for regular personal use, including uses that involved application to the genital and perineal areas.

106. At all relevant times, Johnson & Johnson knew or should have known, based upon decades of scientific and medical information, that regular and prolonged perineal and genital use of talc-based products was associated with an increased risk of ovarian cancer.

107. The risk of ovarian cancer associated with the regular and prolonged perineal and genital use of the Products was a latent and concealed danger that was not known or obvious to ordinary consumers, including Plaintiff.

108. Johnson & Johnson sold the Products without adequate warnings or instructions concerning the risk of ovarian cancer associated with their intended and reasonably foreseeable use.

109. Johnson & Johnson's failure to provide adequate warnings concerning this latent and concealed danger rendered the Products defective and unreasonably dangerous to users and consumers, including Plaintiff.

110. The Products were expected to and did reach consumers, including Plaintiff, without substantial change in the condition in which they were manufactured and sold, including without adequate warnings concerning the risk of ovarian cancer.

111. Plaintiff used the Products in an intended and reasonably foreseeable manner.

112. Had Plaintiff been adequately warned of the risk of ovarian cancer associated with such use, she would not have purchased or used the Products.

113. As a direct and proximate result of the defective and unreasonably dangerous condition of the Products and Defendants' failure to provide adequate warnings, Plaintiff has suffered and will continue to suffer physical injury, pain and suffering, emotional distress, medical expenses, loss of enjoyment of life, impairment of quality of life, and other economic and noneconomic damages to be proven at trial.

## VI.    SECOND CAUSE OF ACTION: STRICT LIABILITY
### (DESIGN AND/OR MANUFACTURING DEFECT)

114.    At all relevant times, Johnson & Johnson and its consumer-product subsidiaries and predecessors were engaged in the business of designing, manufacturing, marketing, distributing, and selling the Products.

115.    The Products were defective in design and were not reasonably safe because their talc-based formulation exposed users, including Plaintiff, to a foreseeable risk of ovarian cancer when used in an intended and reasonably foreseeable manner.

116.    At the time the Products were designed, manufactured, and sold, a reasonable and feasible alternative design existed through the use of cornstarch rather than talc.

117.    Cornstarch-based powders were capable of serving the same or substantially similar intended purposes as the Products without exposing consumers to the same risks associated with talc.

118.    The foreseeable risks of harm posed by the Products could have been reduced or avoided through the adoption of a cornstarch-based formulation, and Johnson & Johnson's failure to adopt that reasonable alternative design rendered the Products not reasonably safe.

119.    The Products were intended to, and did, reach Plaintiff without substantial change in the condition in which they were designed, manufactured, and sold.

120.    Plaintiff used the Products in an intended and reasonably foreseeable manner.

121.    As a direct and proximate result of the defective design and/or defective manufacture of the Products, Plaintiff has suffered and will continue to suffer physical injury, pain and suffering, emotional distress, medical expenses, loss of enjoyment of life, impairment of quality of life, and other economic and noneconomic damages to be proven at trial.

## VII.    THIRD CAUSE OF ACTION: NEGLIGENCE

122.    As manufacturers and sellers of the Products, Johnson & Johnson owed Plaintiff and other foreseeable users a duty to exercise reasonable care in the design, manufacture, testing, inspection, labeling, marketing, distribution, and sale of the Products.

123.    Johnson & Johnson further owed a duty to exercise reasonable care to ensure that the Products were reasonably safe for their intended and reasonably foreseeable uses, including regular and prolonged application by women to the perineal and genital area.

124.    Johnson & Johnson knew or, in the exercise of reasonable care, should have known of scientific and medical evidence associating regular and prolonged perineal and genital use of talc-based powders with an increased risk of ovarian cancer.

125.    Johnson & Johnson breached its duties to Plaintiff by failing to exercise the care that reasonably careful manufacturers and sellers of talc-based body powders would have exercised under the same or similar circumstances, including by negligently:

    A.   Failing to adequately investigate and test the Products for risks associated with regular and prolonged perineal and genital use;

    B.   Failing to adequately evaluate scientific and medical evidence concerning the association between perineal and genital talc use and ovarian cancer;

    C.   Failing to design and formulate the Products to reduce or eliminate foreseeable risks of harm, including by failing to utilize safer available alternatives such as cornstarch;

    D.   Failing to adequately inspect, test, and control the talc used in the Products for contaminants and other hazardous materials;

    E.   Failing to provide adequate warnings or instructions concerning the risk of ovarian cancer associated with regular and prolonged perineal and genital use of the Products;

    F.   Failing to instruct consumers concerning methods of avoiding or reducing exposure to talc associated with an increased risk of ovarian cancer;

    G.   Marketing, promoting, and labeling the Products as safe and suitable for use on the body, including feminine, perineal, and genital use, despite information concerning the potential health risks associated with such use;

H. Continuing to manufacture, market, distribute, and sell talc-based Products after Johnson & Johnson knew or reasonably should have known of the risks associated with their intended and foreseeable use; and

I. Otherwise failing to act as reasonably careful manufacturers and sellers would have acted under the same or similar circumstances.

126. Johnson & Johnson's negligent acts and omissions exposed Plaintiff to risks of harm that were reasonably foreseeable.

127. Plaintiff used the Products in an intended and reasonably foreseeable manner for more than forty years, including regular application to her perineal and genital area.

128. Had Johnson & Johnson exercised reasonable care, including providing adequate warnings or by utilizing a reasonably safe alternative formulation, Plaintiff would not have been exposed to the Products in the manner and to the extent alleged herein.

129. As a direct and proximate cause of Defendants' negligence, Plaintiff has suffered and will continue to suffer physical injury, pain and suffering, emotional distress, medical expenses, loss of enjoyment of life, impairment of quality of life, and other economic and noneconomic damages to be proven at trial.

## VIII.   FOURTH CAUSE OF ACTION: INTENTIONAL MISREPRESENTATION

130. In marketing and selling Johnson's® Baby Powder and Shower to Shower™, Johnson & Johnson made affirmative representations to consumers, including Plaintiff, concerning the nature, suitability, and appropriate uses of the Products.

131. Among other representations, Johnson & Johnson represented that Johnson's® Baby Powder was "clinically proven gentle and mild" and instructed adult consumers: "For you, use every day to help feel soft, fresh, and comfortable."

132. Johnson & Johnson further marketed Johnson's® Baby Powder to women and teenage girls for regular personal and feminine-hygiene use, including use on and around the genital and perineal areas.

133. These representations were false and misleading because Johnson & Johnson failed to disclose that regular and prolonged genital and perineal use of its talc-based Products was associated with an increased risk of ovarian cancer and that such use presented health risks material to a consumer's decision whether to purchase and use the Products.

134. During the period in which it continued to market and sell the Products, Johnson & Johnson received scientific, medical, regulatory, and other information concerning the association between genital and perineal talc use and ovarian cancer.

135. By at least 1982, Johnson & Johnson was aware of epidemiological research reporting a statistically significant association between genital talc use and ovarian cancer.

136. Following publication of that research, Dr. Daniel Cramer advised a representative of Johnson & Johnson that consumers should be warned of the potential ovarian-cancer risk associated with genital use of talcum powder.

137. Johnson & Johnson thereafter received additional information concerning the potential ovarian-cancer risk associated with genital talc use, including the 1994 correspondence from the Cancer Prevention Coalition urging Johnson & Johnson to warn consumers or replace talc with an available cornstarch alternative, subsequent epidemiological research, the 2006 IARC classification concerning perineal use of talc-based body powder, and health-hazard information supplied by its talc supplier.

138. Despite this information, Johnson & Johnson continued to affirmatively market the Products for regular personal and feminine-hygiene use without disclosing the ovarian-cancer risk associated with the very manner of use it encouraged.

139.    Johnson & Johnson participated in efforts to dispute, minimize, or cast doubt upon scientific evidence concerning the health risks associated with talc and sought to influence the scientific, regulatory, and public discussion concerning the safety of talc-containing products.

140.    Johnson & Johnson's continued representations concerning the suitability of the Products for daily and feminine-hygiene use, while withholding material information concerning the potential ovarian-cancer risk associated with that use, were intended to create and maintain the belief among consumers that the Products could continue to be safely used in the manner Johnson & Johnson promoted.

141.    Johnson & Johnson made these representations with the intent that consumers, including Plaintiff, would rely upon them in deciding to purchase, continue purchasing, and continue using the Products.

142.    Plaintiff was exposed to and relied upon the Products' labeling and representations throughout the period of her use and reasonably understood those representations to mean that the Products were appropriate and safe for the regular personal- and feminine-hygiene uses for which they were promoted.

143.    Plaintiff reasonably believed Johnson & Johnson's representations to be true and, in reliance upon them and the absence of contrary warnings, purchased and continued to use Johnson's® Baby Powder and Shower to Shower™ for decades, including regular application to her underwear and genital and perineal areas.

144.    Plaintiff did not know that Johnson & Johnson possessed information concerning an association between regular genital and perineal talc use and ovarian cancer.

145.    Had Johnson & Johnson truthfully disclosed the material health information known to it and not represented the Products as appropriate for regular personal- and feminine-hygiene

use without qualification, Plaintiff would not have purchased or used the Products in the manner alleged herein.

146. Johnson & Johnson's misrepresentations and Plaintiff's reliance thereon were a direct and proximate cause of Plaintiff's continued use of and exposure to the Products.

147. As a direct and proximate result of Johnson & Johnson's intentional misrepresentations, Plaintiff developed ovarian cancer and has suffered and will continue to suffer the injuries and damages alleged herein.

148. Johnson & Johnson's representations were made knowingly, intentionally, and with the purpose of inducing consumers, including Plaintiff, to purchase and continue using the Products despite material information concerning the health risks associated with the Products' intended and foreseeable use.

## IX.    FIFTH CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION

149. Johnson & Johnson was engaged in the business of manufacturing, marketing, distributing, and selling Johnson's® Baby Powder and Shower to Shower™ and had a direct pecuniary interest in consumers purchasing and continuing to use the Products.

150. In the course of that business, Johnson & Johnson supplied information to consumers, including Plaintiff, concerning the characteristics, suitability, and appropriate uses of the Products for the purpose of guiding consumers in deciding whether to purchase and use them.

151. Among other representations, Johnson & Johnson represented that Johnson's® Baby Powder was "clinically proven gentle and mild" and instructed adult consumers: "For you, use every day to help feel soft, fresh, and comfortable."

152. Johnson & Johnson further marketed Johnson's® Baby Powder to women and teenage girls for regular personal- and feminine-hygiene use, including use on and around the genital and perineal areas.

153.    Johnson & Johnson similarly represented that Shower to Shower™ was appropriate for regular, whole-body use and advertised that consumers could use the product to remain "dry, fresh and comfortable throughout the day" and that Shower to Shower™ "can be used all over your body."

154.    Through these statements, advertisements, labels, and other communications, Johnson & Johnson supplied information conveying that the Products were suitable for regular and repeated personal- and feminine-hygiene use, including use on and around the genital and perineal areas.

155.    The information supplied by Johnson & Johnson was false, incomplete, and misleading because it failed to disclose material information concerning the association between regular and prolonged genital and perineal use of talc-based body powders and an increased risk of ovarian cancer.

156.    Johnson & Johnson possessed or had access to scientific, medical, regulatory, and supplier information concerning the potential health risks associated with genital and perineal talc use, including epidemiological studies, communications from scientists and public-health advocates, international classifications, and information provided by its talc suppliers.

157.    In light of the information available to it, Johnson & Johnson knew or, in the exercise of reasonable care, should have known that its representations concerning the suitability of the Products for regular personal- and feminine-hygiene use were incomplete and misleading without disclosure of the potential ovarian cancer risk associated with such use.

158.    Johnson & Johnson failed to exercise reasonable care or competence in obtaining, evaluating, verifying, and communicating information concerning the safety of the Products and the risks associated with their intended and reasonably foreseeable use.

159. Johnson & Johnson further failed to exercise reasonable care in continuing to communicate information encouraging daily and feminine-hygiene use of the Products without providing consumers with complete and accurate information concerning the potential health risks associated with such use.

160. Johnson & Johnson supplied the foregoing information for the purpose of inducing and guiding consumers, including Plaintiff, in purchasing and using the Products.

161. Plaintiff was exposed to and relied upon the Products' labeling, advertising, and representations and reasonably understood those representations to mean that the Products were appropriate for regular personal- and feminine-hygiene use.

162. Plaintiff justifiably relied upon the information supplied by Johnson & Johnson in purchasing and continuing to use Johnson's® Baby Powder and Shower to Shower™ for decades, including regular application to her underwear and genital and perineal areas.

163. Plaintiff did not know that Johnson & Johnson possessed or had access to information concerning an association between regular genital and perineal talc use and ovarian cancer.

164. Had Johnson & Johnson exercised reasonable care in obtaining and communicating information concerning the Products and accurately disclosed the risks associated with regular genital and perineal talc use, Plaintiff would not have purchased or used the Products in the manner alleged herein.

165. As a direct and proximate result of Johnson & Johnson's negligent misrepresentations and Plaintiff's justifiable reliance thereon, Plaintiff purchased and continued to use the Products and was repeatedly exposed to talc over a period of decades.

166.    Plaintiff thereby suffered damages, including amounts expended in purchasing the Products, medical expenses, and the other injuries and damages alleged herein.

## X.    SIXTH CAUSE OF ACTION: FRAUDULENT CONCEALMENT/NON-DISCLOSURE

167.    In manufacturing, marketing, promoting, distributing, and selling Johnson's® Baby Powder and Shower to Shower™, Johnson & Johnson possessed knowledge concerning the composition, characteristics, testing, safety, and health risks associated with the Products that was not reasonably available to ordinary consumers, including Plaintiff.

168.    Johnson & Johnson knew that consumers purchasing and using the Products would reasonably rely upon Johnson & Johnson, as the manufacturer and seller of the Products, to disclose material health and safety information concerning the Products and their intended and reasonably foreseeable uses.

169.    Johnson & Johnson had a duty to disclose material information concerning the health risks associated with the Products because such information concerned latent dangers known or reasonably knowable to Johnson & Johnson but not known or readily discoverable by ordinary consumers.

170.    Johnson & Johnson further assumed and incurred a duty to make full and accurate disclosure concerning the Products because it affirmatively communicated with consumers regarding the Products' characteristics, suitability, gentleness, and appropriate uses.

171.    Among other representations, Johnson & Johnson represented that Johnson's® Baby Powder was "clinically proven gentle and mild," instructed adult consumers to "use every day to help feel soft, fresh, and comfortable," and marketed the Product to women and teenage girls for regular personal- and feminine-hygiene use.

172.    Johnson & Johnson similarly marketed Shower to Shower™ for regular whole-body use and represented that consumers could use the Product to remain "dry, fresh and comfortable throughout the day" and that Shower to Shower™ "can be used all over your body."

173.    Having chosen to speak concerning the characteristics, suitability, and appropriate uses of the Products, Johnson & Johnson had a duty to disclose material information necessary to prevent those representations from creating a false or misleading impression concerning the safety of the Products when used in the manner Johnson & Johnson promoted.

174.    Johnson & Johnson also had a duty to disclose facts concerning the Products that it knew would materially affect consumers' decisions whether to purchase, continue purchasing, or continue using the Products.

175.    Johnson & Johnson obtained scientific, medical, regulatory, supplier, and other information concerning the association between regular and prolonged genital and perineal talc use and ovarian cancer.

176.    By at least 1982, Johnson & Johnson was aware of epidemiological research reporting an association between genital talc use and ovarian cancer and was specifically advised that consumers should be warned of the potential ovarian-cancer risk associated with genital use of talcum powder.

177.    Johnson & Johnson thereafter received additional information concerning the potential risk, including further epidemiological studies, the 1994 Cancer Prevention Coalition correspondence urging warnings or replacement of talc with cornstarch, the 2006 IARC classification concerning perineal use of talc-based body powder, and health-hazard information supplied by its talc supplier.

178.    The foregoing information was material because a reasonable consumer would consider information concerning an increased risk of ovarian cancer important in deciding whether to purchase or regularly apply a talc-based powder to her genital and perineal areas.

179.    Despite its knowledge and its duty to disclose, Johnson & Johnson failed to disclose this material information to consumers, including Plaintiff, while continuing to market and promote the Products for regular personal- and feminine-hygiene use.

180.    Johnson & Johnson's nondisclosures were not inadvertent. As alleged above, Johnson & Johnson continued to promote and sell the Products without an ovarian-cancer warning after receiving repeated scientific and other information concerning the risk associated with genital and perineal talc use.

181.    Johnson & Johnson further participated in efforts to dispute, minimize, or cast doubt upon scientific evidence concerning the health risks associated with talc and sought to influence the scientific, regulatory, and public discussion concerning the safety of talc-containing products.

182.    Through its concealment, nondisclosure, affirmative marketing, and other conduct, Johnson & Johnson intentionally prevented consumers, including Plaintiff, from acquiring material information necessary to make an informed decision concerning whether to purchase and use the Products.

183.    Johnson & Johnson intended that consumers, including Plaintiff, continue to purchase and use the Products without knowledge of the concealed information concerning the potential ovarian-cancer risk associated with regular genital and perineal use.

184.    Plaintiff did not know, and through the exercise of reasonable diligence could not have known, the material information concerning the association between genital and perineal talc use and ovarian cancer that Johnson & Johnson possessed and failed to disclose.

185.    In the absence of disclosure and in light of Johnson & Johnson's affirmative representations concerning the Products, Plaintiff reasonably believed that Johnson's® Baby Powder and Shower to Shower™ were appropriate for the regular personal- and feminine-hygiene uses for which they were marketed.

186.    Plaintiff relied upon Johnson & Johnson's representations and nondisclosures in purchasing and continuing to use the Products, including regular application to her underwear and genital and perineal areas.

187.    Had Johnson & Johnson disclosed the material information concerning the ovarian-cancer risk associated with regular genital and perineal talc use, Plaintiff would not have purchased or used the Products in the manner alleged herein.

188.    As a direct and proximate result of Johnson & Johnson's fraudulent concealment and nondisclosure, Plaintiff purchased and continued to use the Products and suffered pecuniary loss, including amounts paid for the Products and medical and related expenses, together with the other injuries and damages alleged herein.

189.    Johnson & Johnson's concealment and nondisclosure were intentional, willful, and undertaken with conscious disregard for the rights and safety of consumers, including Plaintiff.

## XI.    DAMAGES

190.    As a direct and proximate result of Johnson & Johnson's negligent, reckless, willful, wanton, fraudulent, and wrongful acts and omissions, as well as Johnson & Johnson's

misrepresentations, concealment, and nondisclosures, Plaintiff is entitled to compensation and to recover the following damages:

a. Past and future physical pain and suffering in an amount to be proven at trial;

b. Past and future emotional pain and suffering in an amount to be proven at trial;

c. Past and future loss of enjoyment of life in an amount to be proven at trial;

d. Past and future disability in an amount to be proven at trial;

e. Past and future loss of income and earning capacity in an amount to be proven at trial;

f. Past and future medical and related expenses in an amount to be proven at trial;

g. Past and future caretaking in an amount to be proven at trial;

h. Past and future disfigurement in an amount to be proven at trial;

i. Other past and future pecuniary loss in an amount to be proven at trial;

j. Punitive damages; and

k. All allowable costs, expenses, and fees associated with this litigation.

## XII.    PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests this Court enter judgment against Defendants in an amount supported by the allegations of this Complaint and the evidence at trial as follows:

1. Judgment against Defendants for general damages in an amount consistent with the allegations of this Complaint and to be proven at trial;

2. Judgment against Defendants for exemplary damages in an amount consistent with the allegations of this Complaint and to be proven at trial;

3. Judgment against Defendants for special damages in an amount consistent with the allegations in this Complaint and to be proven at trial; and

4. Judgement for costs, interests, and such other and further relief as this Court deems just and equitable.

Respectfully submitted this 11th day of August, 2026.

*/s/ Emily S. Madden*
Mel C. Orchard, III (WSB # 5-2984)
Emily S. Madden (WSB # 7-6272)

Case 2:26-cv-00237-SPK    Document 1    Filed 08/11/26    Page 30 of 30

THE SPENCE LAW FIRM, LLC
15 S. Jackson Street / P.O. Box 548
Jackson, WY 83001
307-733-7290 / 307-733-5248 (fax)
orchard@spencelawyers.com
madden@spencelawyers.com

*Attorneys for Plaintiff*

PLAINTIFF'S COMPLAINT
PAGE 30 OF 30